*307 OPINION OF THE COURT
Gerald Sheindlin, J.
The defendant moves for dismissal of the above-captioned indictment pursuant to CPL 30.30 (1) (a) claiming the People were not ready for trial within six months of the commencement of the action. The People oppose in their answering affirmation claiming that they have satisfied their statutory obligations. A crucial issue of first impression was presented to the court: whether the adult victim’s psychological trauma constituted emotional unavailability, thereby rendering certain time periods excludable as an exceptional circumstance pursuant to CPL 30.30 (4) (g).
A hearing was held on this issue on September 10, 1997, September 26, 1997, October 16, 1997 and November 10, 1997. Detective Reinaldo Palermo, Detective Patricia Powers, Police Officer Michael White and Doctor Robert Berger testified on behalf of the prosecution. Doctor Robert Goldstein testified for the defense. The court finds the testimony of the People’s witnesses to be consistent, reliable, trustworthy and have the force and flavor of credibility. The court finds that the testimony and opinion of Dr. Goldstein is not fully supported by the evidence.
Chronology
On July 5, 1995, the defendant was arraigned on the initial felony complaint. The case was adjourned for Grand Jury action. The presentation was complete on July 13,1995 when the defense waived the restrictions pursuant to CPL 180.80. On July 20, 1995, the defendant’s attorney consented to both the withdrawal of the case from the Grand Jury and an adjournment for further investigation of his Ghent’s involvement in the incident.[1] On October 25, 1995, the court dismissed the felony complaint without prejudice on motion of the People. On May 7, 1997, the defendant was rearrested and arraigned on a second felony complaint and the case was adjourned for Grand Jury action. This second felony complaint consisted of the same allegations against the defendant.[2] The defendant was subsequently indicted.
*308 Findings of Fact
On July 3, 1995, Evelyn Delahoz was the victim of a robbery of a check cashing establishment during which she was shot multiple times, paralyzing her from the chest down. As a result of the gunshot wounds suffered during the robbery, Ms. Delahoz was hospitalized at Jacobi Hospital for three weeks, Lenox Hill Hospital for approximately one month and Mt. Sinai Hospital for about three months. However, her paralysis remained and is permanent.
Before the robbery, Ms. Delahoz was described by her husband, Police Officer Michael White, as a strong, independent, outspoken woman who always was gainfully employed. Subsequent to her injuries, she required assistance with every daily event. She became extremely withdrawn and distant and would not speak unless directly addressed. She constantly cried uncontrollably and often had difficulty sleeping. Ms. Delahoz refused to speak about the incident unless probed by questions. If the subject arose, she would shake and cry and attempt to change the subject. Improvements in her condition would fade after attempts to discuss the incident.
After being released from her various hospitalizations, Ms. Delahoz moved to the Dominican Republic with her mother. In January of 1997, Detective Reinaldo Palermo of the Bronx District Attorney’s Detective Squad visited Ms. Delahoz in the Dominican Republic. During the interview, Ms. Delahoz indicated she wanted to forget what had happened to her. Her demeanor visibly changed when talking about the case: she became tense and nervous, her hands started shaking, her voice trembled and became hesitant and barely audible. She started crying intermittently and required frequent intermissions to allow her to compose herself. She was unable to narrate the events or speak in complete sentences. She could not or refused to recall much about the incident. Her hands and shoulders visibly shook when photographs of possible perpetrators were displayed to her and her voice trembled upon identifying the photographs. She demanded that her husband be present during the interviews.
In May of 1997, Detective Patricia Powers of the Bronx Robbery Squad traveled to the Dominican Republic to visit with Ms. Delahoz. The purpose was to show her a videotape of a lineup. Ms. Delahoz desired the presence of her husband during the interview and refused to meet the detectives when they initially visited her house. At a second visit later that same day, Detective Powers spoke to Ms. Delahoz for several hours *309 to gain her confidence before discussing the facts of the case. The next day Detective Powers was able to speak with Ms. Delahoz about the case. However, upon the display of a photo array, Ms. Delahoz became hysterical for about 15 minutes. She cried and trembled during the interview. She informed Detective Powers that she could not bring herself to discuss the events from beginning to end. Her voice remained monotone throughout the interview.
Ms. Delahoz was examined by two forensic psychiatrists: Dr. Robert Berger for the prosecution and Dr. Robert Goldstein on behalf of the defendant.[3] Dr. Berger reviewed Ms. Delahoz’s medical records and the transcript of the hearing and examined her on October 20, 1997 and October 30, 1997. He diagnosed Ms. Delahoz as suffering from chronic and persistent Post-Traumatic Stress Disorder which continued to the time of the hearing.[4] Dr. Berger found that Ms. Delahoz led a normal and unremarkable life prior to the shooting with no evidence of premorbid predisposition to depression or depressive symptoms or anxiety. On the contrary, he found her to be assertive and independent. He described the symptoms of Post-Traumatic Stress Disorder (hereafter PTSD) as including nightmares, spontaneous bouts of crying or tearfulness and avoidance of the topic of conversation. He noted her lack of motivation in the hospital as a classic symptom of PTSD. The symptoms were more severe and intense at certain times and less so at others. He expected the intensity of the symptoms to diminish over time and to eventually resolve completely.
Dr. Berger noted that for approximately two years following the shooting Ms. Delahoz markedly avoided any stimuli or thing or thought related to or reminiscent of the initial trauma. Even the appearance of an individual who barely shared the same complexion as one of the individuals produced anxiety, tearfulness and fearfulness. When discussion of the events was attempted, Ms. Delahoz would become anxious, tearful and hysterical and she would dissuade others, including her husband, from the subject, Dr. Berger further observed that although she experienced intense symptoms during the detectives’ visit in May of 1997, these interviews marked the first *310 time Ms. Delahoz was able to speak about the incident. He described her ability to discuss additional elements of the incident at each of the three visits as “desensitization”. He believed that even though Ms. Delahoz continued to experience severe symptoms of anxiety, tearfulness and fearfulness, she became more able to confront and discuss the events during the summer of 1997.
At times during the interviews with Dr. Berger, Ms. Delahoz was visibly upset, tearful, crying and shaking, thereby demonstrating evidence of psycho-mode agitation. At other times, she was bland and blunt in affect and relayed the events in a matter of fact manner without any emotionality, a condition Dr. Berger defined as “psychic numbing or psychic anesthesia” and another defense mechanism. Dr. Berger determined that the symptoms of PTSD prevented Ms. Delahoz from cooperating with law enforcement and participating in the prosecution and investigation of the case, including testifying in open court before a jury, for a significant period of time after the events in question: from July 1995 to May 1997. He opined that at the time of his examinations in October 1997, Ms. Delahoz was able to testify in open court, although he cautioned that she would still experience symptoms of anxiety, tearfulness, agitation and fearfulness. However, she would be able to cope with those feelings.
Dr. Goldstein examined Ms. Delahoz on October 24, 1997 and diagnosed her as suffering from an adjustment disorder with anxiety and depression. He opined that this time-limited psychiatric disturbance had a duration of approximately six months.[5] He did not observe any symptoms of this disorder during his examination. He found that, although she was somewhat depressed during the interview, she had an excellent adjustment to her handicap and her severely modified existence.
Dr. Goldstein indicated that being shot five times might be a cause of Post-Traumatic Stress Disorder and was consistent with a diagnosis of either PTSD or adjustment disorder. He described PTSD as being the exception rather than the rule and found that Ms. Delahoz did not suffer from the more serious PTSD because: (1) she was not in the dire distress of classic sufferers who long for relief from the symptoms in that Ms. Delahoz’s refusal of treatment indicated she did not suffer from *311 PTSD, and (2) she did not suffer the significant impairment in functioning that is associated with PTSD patients. However, he conceded that PTSD sufferers prefer not to speak about the triggering event and avoid events reminiscent of it. He further admitted that avoidance was more consistent with a diagnosis of PTSD and less consistent with a diagnosis of adjustment disorder.
Dr. Goldstein found that Ms. Delahoz was able to relate the entire narrative of the events during the January visit of the detectives and would have been able to testify in court as of that date. Dr. Goldstein believed that Ms. Delahoz would have been able to relate the entire scenario of events before January of 1997 if others had employed the same persistence as the detectives who visited her in January.
The two doctors agreed that the primary difference in their respective diagnosis was one of intensity and duration of the symptoms.
Conclusions of Law
Periods of delay excluded from speedy trial calculations include those “occasioned by exceptional circumstances, including but not limited to, the period of delay resulting from a continuance granted at the request of a district attorney if (i) the continuance is granted because of the unavailability of evidence material to the people’s case, when the district attorney has exercised due diligence to obtain such evidence and there are reasonable grounds to believe that such evidence will become available in a reasonable period; or (ii) the continuance is granted to allow the district attorney additional time to prepare the people’s case and additional time is justified by the exceptional circumstances of the case.” (CPL 30.30 [4] [g].)
The statute contemplates two theories of exclusion. The first ground permits the exclusion of time for unavailable material evidence if the People exercise due diligence to obtain the evidence and “there are reasonable grounds to believe that such evidence will become available in a reasonable period”. (CPL 30.30 [4] [g] [i].) The second ground is merely when the exceptional circumstances of the case justify an adjournment to provide the People with more time to prepare their case.
Exceptional circumstances include the unavailability of a principal prosecution witness for medical reasons. (People v Goodman, 41 NY2d 888 [1977].) Documented physical injury will establish a complainant’s unavailability. (See, e.g., People v Ali, 209 AD2d 227 [1st Dept 1994] [complainant’s surgery *312 and recuperation]; People v Pagano, 207 AD2d 685 [1st Dept 1994] [medical affirmation]; People v Pharr, 204 AD2d 126 [1st Dept 1994] [officer’s injuries documented]; People v Celestino, 201 AD2d 91 [1st Dept 1994] [detective’s broken leg].)
The courts that have decided the issue of emotional unavailability have dealt with child victims of sexual abuse. In People v Matthews (227 AD2d 313, 314 [1st Dept], lv denied 88 NY2d 989 [1996]), the eight-year-old victim was found to be “unavailable due to the emotional trauma caused by the kidnapping and repeated sodomy” and a two-month period of time was excluded as exceptional circumstances. In People v Lashway (187 AD2d 747 [3d Dept 1992], lv denied 81 NY2d 842 [1993]), the initial felony complaint was dismissed without prejudice due to the 11-year-old victim’s refusal to testify. The victim finally agreed to testify and indictment was returned. Noting the unique and sensitive circumstance of the case, the court excluded a 22-month period of time during which the complainant refused to testify. (People v Lashway, supra, at 749.) The dismissal of the felony complaint without prejudice indicated the delicacy of the situation. As the Court stated “Significantly, this is not a situation where defendant could have been lulled by the delay into thinking no reprosecution was imminent”. (People v Lashway, supra, at 749.)
In People v Abreu (NYLJ, Mar. 28, 1997, at 33, col 5 [Sup Ct, Kings County]), the 11-year-old victim of sexual abuse at the hands of her father was so traumatized by the abuse that she could not proceed to trial. The treating doctor indicated she was attending weekly clinical sessions for six months and continued to suffer from nightmares, sad facial expressions, and frequent bouts of crying. Attempts to discuss the alleged abuse resulted in the child becoming extremely upset. The court deemed the victim to be unavailable “because of emotional trauma caused by a defendant’s alleged criminal acts”. (Supra.) Accordingly, exceptional circumstances were established and the time was excluded.
The emotional and psychological trauma the complainant suffered at the hands of the perpetrators is as severe and all encompassing as that described in the aforementioned cases. Although she was not a child victim of sexual abuse, Ms. Delahoz underwent an extremely violent and horrifying event that radically altered her life. In addition to the severe physical disability of being paralyzed, Ms. Delahoz suffered intense psychological repercussions that rose to the level of Post-Traumatic Stress Disorder. She attempted to avoid all thoughts
*313 or events that would remind her of the shooting. Accordingly, the court finds that because of her severe psychological impairment she was emotionally unavailable for the period commencing July 1995 to May 1997. This time period is excluded from speedy trial calculations pursuant to CPL 30.30 (4) (g) (i).[6]

. The presentation concerning the two codefendants, Gregory Fuller and Leslie Singleton, was not withdrawn and they were indicted by the Grand Jury.

. The court rejects the People’s argument that the 1997 prosecution constitutes a new case and determines that it is in fact a continuation of the 1995 prosecution.

. Both doctors were declared to be experts in forensic psychiatry without objection.

. At the first interview, Dr. Berger administered various psychodiagnostic tests to measure personality functioning and clinical syndromes. He found the results consistent with his diagnosis. Dr. Goldstein did not perform similar tests.

. Dr. Goldstein indicated that a longer duration than six months could be consistent with either PTSD or adjustment disorder.

. The court notes that the People must use due diligence to obtain the evidence. (CPL 30.30 [4] [g]; People v Zirpola, 57 NY2d 706, 708 [1982].) However, in the instant case, the court finds that no amount of diligence would have made the complainant available during this time period. (People v Pressley, 115 AD2d 228 [4th Dept 1985].) In addition, any break in communication between the prosecution and the complainant while she was in the Dominican Republic does not provide a basis for doubting the complainant’s ultimate availability. (People v Pomales, 159 AD2d 451, 452 [1st Dept], lv denied 76 NY2d 847 [1990].)